## STATE, Respondent, v. KOLLER, Appellant: FRANKOVIS, Defendant.

Supreme Court

*No. 76–006–CR. Argued November 1, 1978.—*
*Decided January 30, 1979.*
(Also reported in 274 N.W.2d 651.)

254

For the appellant there were briefs by *Francis R. Croak, Kathleen Ortman Miller* and *Cook & Franke, S. C.,* and a supplemental brief by *James R. Glover* and *Shellow & Shellow,* with oral argument by *Mr. Glover,* all of Milwaukee.

For the respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

DAY, J. This is an appeal to review a judgment of the Milwaukee County Circuit Court, the Honorable John L. Coffey, presiding, entered October 24, 1975, convicting the defendant of robbery, party to a crime, in violation of secs. 943.32(1)(a), and 939.05, Stats. 1975, and from the denial of defendant's motion for a new trial under sec. 974.02, deemed denied January 22, 1976. In addition, in a supplemental brief, the defendant appeals from the order of the trial court denying his 974.06 post-conviction relief motion, entered June 23, 1978.

The questions presented by this appeal are:

1. Was the defendant denied the effective assistance of counsel, contrary to the Sixth Amendment of the United States Constitution, because his attorney also represented his codefendant at trial?

2. Was the evidence sufficient to support the judgment of conviction?

3. Was the defendant denied the benefit of the presumption of innocence because the trial court, in its instruction to the jury, failed to include the statement "a defendant is not required to prove his innocence."?

4. Did the actions of the trial court indicate a bias against the defendant and deny him the right to trial by jury in an impartial forum?

5. Was the defendant denied his right to call witnesses in support of his defense and to due process when the trial court excused a witness from testifying who asserted his privilege against self-incrimination after being advised that the state might re-file charges against him which had been previously dismissed?

6. Did the trial court err in striking testimony given by the witness prior to his assertion of the privilege against self-incrimination?

7. Should the trial court have reassigned the case to another judge to hear the 974.06 motion on the ground that he was a material witness to the events that occurred during the unrecorded conference at the bench?

We conclude that the judgment and orders should be affirmed.

At approximately 3:30 a.m., Sunday, April 27, 1975, Gregory Nauertz went to the New Yorker bar to meet his girlfriend who was an employee of the establishment. He testified that as he entered the front door to the tavern, he was grabbed and thrown to the floor. He saw that the person on top of him was Gregory Frankovis, the codefendant of Robert Lee Koller, the appellant in this case. Nauertz was able to observe only Frankovis, who began to beat Nauertz about the face with his fists. Nauertz also testified that he heard Frankovis telling someone, "kick him in the head, lets kill him." After hearing that statement, Nauertz felt somebody kicking him in the head and choking him, but he did not know who was doing the kicking. He testified that at the time he was being kicked in the head, Frankovis was sitting on top of him, straddling his body with his feet pointed toward Nauertz's feet.

At trial, Nauertz identified a wallet and chain which had been kept in his pocket and clipped to his belt on the night of the beating incident. He had $37 in the wallet when he entered the New Yorker. He did not know whether the wallet left his possession while he was in the New Yorker, but he discovered it was missing when he

was at the hospital. He next saw the wallet in the Police Administration Building when the police returned it and the $37 to him.

Nauertz testified that he did not know Koller, but that he had known Frankovis for about a year. On cross-examination, he admitted that he and Frankovis had testified on opposite sides in another criminal trial earlier in the year, and that the defendant in that case was a friend of Frankovis'. He admitted that he did not like Frankovis, but he denied that he had a grudge against him.

The two police officers who were the first to arrive on the scene testified that they looked through the window of the front door of the New Yorker and saw Frankovis on top of Nauertz choking him. There was a dispute in the trial record as to the lighting conditions in the alcove of the tavern where the fight was going on. The state's witnesses testified that there was sufficient light to see what was going on, while the defense witnesses testified that the alcove was very dark. One of the police officers testified that he had shone his flashlight through the window of the front door on the people fighting in the hallway. Patrolman Randy Baier testified that he saw Koller making kicking motions with his feet. While he never actually saw Koller's feet make contact with Nauertz's body, he added, "he certainly couldn't have missed him." Baier identified Koller at trial, but the assistant district attorney who prepared the criminal complaint, testified on cross-examination that when the police officers described the incident at the time the complaint was drafted, Baier was able to identify Frankovis, but not Koller as one of the participants in the fight. Patrolman Peter Simet testified that he saw Koller kicking Nauertz in the side, and that when the bartender came to open the door for the police, he saw Koller run toward the rear door of the tavern.

When Patrolman Robert Gross arrived on the scene, he was waved down by Patrolman Baier and told to cover

the rear door of the tavern. As he approached the rear hallway, he saw a man come out the rear door and throw a black wallet with a chain attached to it onto the ground. He testified that he stopped the man, and when he asked for his name, the man replied Robert Koller. Gross walked the man back into the tavern. However, when Patrolman Gross identified the man in court, he identified Frankovis, not Koller. The wallet was identified as belonging to the victim, Gregory Nauertz.

Despite Patrolman Gross's failure to identify Koller in court, Officers Larry Parr and David Nowak identified Koller as the man with whom Patrolman Gross entered the tavern. Gross turned over the man he stopped behind the tavern to Officer Parr.

Barbara Johnson, Nauertz's girlfriend, testified that Frankovis and Koller grabbed Nauertz as he entered the front door of the tavern. She said that Frankovis said, "I'm going to kill you," and started to beat Nauertz. Koller, she said, was kicking Nauertz for about three to five minutes. She said that she heard Koller say to Frankovis, "you were dead." She said that Frankovis told Koller to kick Nauertz in the head and that Koller did so. She testified that when the police began to pound on the front door, Koller ran toward the back door. Frankovis was still on top of Nauertz when the police arrived. She admitted to having been convicted of obstructing justice for lying to a police officer when she falsely told him that a sixteen year old girl working in a bar was eighteen. She also admitted that she had given false testimony in another criminal trial in which the defendant had been a close friend of Nauertz's. She and Nauertz broke off their relationship shortly after the beating incident, although she testified at trial that she was still in love with him.

Koller testified that the bartender had shut off all the lights in the bar, and that only the telephone lights were on. He said that he was about to leave the bar when he became aware of a scuffle in the alcove of the front en-

trance. He claimed that he told Ms. Johnson to get away because she might get hurt. He also claimed that he did not get involved in the fight and that any kicking he might have done was merely to disentangle his feet so that he could leave the bar. He testified that he saw someone he assumed was Frankovis involved in a "shoving or fighting match. All I saw was his back." Koller testified that he left the tavern through the rear door.

Frankovis testified that he did not start the fight with Nauertz. He claimed that as he was walking out the front door of the tavern, he was struck in the eye. "Well, it took me off guard, you know. So I reached out and grabbed whoever it was by the shoulders and I felt another blow to the side and we started scuffling around and blows were being exchanged and there was a lot of confusion." He also testified that he heard Koller's voice saying, "let's not get involved in this, why didn't you stop." Frankovis said, "I was in the process of defending myself of getting hit anymore times unexpectedly and laying on the floor scuffling."

Both defendants were found guilty by the jury. Koller received an indeterminate sentence of not more than four years at the state prison at Waupun. Frankovis received an indeterminate sentence of not more than six and one-half years at Waupun.

Additional facts will be set forth in the balance of this opinion.

ISSUE #1: WAS THE DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, CONTRARY TO THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, BECAUSE HIS ATTORNEY ALSO REPRESENTED HIS CODEFENDANT AT TRIAL?

The right to counsel guaranteed by the Sixth Amendment of the United States Constitution includes the right

to be effectively represented. *Powell v. Alabama,* 287 U.S. 45. A defendant is entitled to the undivided loyalty of his attorney. As the United States Supreme Court said in *Glasser v. United States,* 315 U.S. 60, 70 (1942) ". . . the 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired."

Neither this court nor the U.S. Supreme Court has ever held that joint representation of two codefendants by a single lawyer per se constitutes ineffective representation. *Mueller v. State,* 32 Wis.2d 70, 77, 145 N.W. 2d 84 (1966) ; *State v. Medrano,* 84 Wis.2d 11, 267 N.W. 2d 586 (1978). The United States Supreme Court recently said in *Holloway v. Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 1178 (1978) :

"One principle applicable here emerges from *Glasser* without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: 'Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.' *Glasser v. United States, supra,* 315 U.S. at 92, 62 S. Ct., at 475 (dissenting.)"

In *Glasser,* the trial court appointed Glasser's attorney to also represent a codefendant, over Glasser's objections. The trial record disclosed a conflict of interest. The attorney failed to cross-examine a government witness who linked Glasser to the conspiracy and failed to object to the admission of arguably inadmissible evidence. The

court concluded that these omissions were motivated by the lawyer's desire to protect the other defendant. The court reversed Glasser's conviction, without determining whether the conflict actually resulted in prejudice to Glasser:

"To determine the precise degree of prejudice sustained by Glasser . . . is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. *Id.* at 75–6.

The rule followed by this court was recently restated in *State v. Medrano, supra,* 84 Wis.2d at 28: "In order to establish that he was denied effective representation by counsel, [the defendant] must establish by clear and convincing evidence that an actual conflict of interest existed. *Hall v. State,* 63 Wis.2d 304, 311, 217 N.W.2d 352 (1974). It is not sufficient that he show a mere possibility or suspicion of a conflict could arise under hypothetical circumstances. *Harrison v. State,* 78 Wis.2d 189, 201, 254 N.W.2d 220 (1977). However, [the defendant] does not have to show actual prejudice; once he shows an actual conflict he is entitled to relief. *Hall,* 63 Wis.2d at 311–312."

In the instant case, the Assistant District Attorney Klinkowitz raised the issue of joint representation at trial. At that time, the following exchange took place:

"*Court:* Mr. Eisenberg, do you feel there is any conflict of interest between your representing both of these defendants?

"*Mr. Eisenberg:* I thoroughly discussed it between Mr. Klinkowitz and the defendants as well as I personally can see no conflict unless the Court sees one.

"*Court:* I am making no such finding. Let's proceed."

The record reveals that there was no conflict of interest at trial.[1] Frankovis and Koller had entirely consistent theories of defense. Koller's position was that he had nothing to do with the fight, that he urged that the parties break it up, and that he himself left because he did not want to become involved. Frankovis' theory was that Nauertz threw the first punch, and that he was merely defending himself in the ensuing fight. Koller's testimony that he saw Frankovis involved in the scuffle did not undermine Frankovis' fair fight theory. Frankovis supported Koller's story when he testified, "I recognized the voice as being Bob saying something to the effect of let's not get involved in this."

Mr. Eisenberg was vigorous in his defense of Koller. At the close of the state's case, he moved that the charges be dismissed as to Koller, but not as to Frankovis. In his closing argument, he played up Patrolman Gross's in court identification of Frankovis as the person he stopped going out the back door of the tavern, even though the man identified himself as Robert Koller.

Based on this record, Mr. Koller has no valid claim that he was denied the effective assistance of counsel.

The appellant also asserts that he was denied the effective assistance of counsel because his attorney failed to request an instruction for the lesser included offense of theft.

The standard for competency of counsel was set out in *State v. Harper*, 57 Wis.2d 543, 557, 205 N.W.2d 1 (1973):

"Effective representation is not to be equated, as some accused believe, with a not-guilty verdict. But the rep-

[1] There was no problem with conflict at sentencing since Koller obtained separate counsel for purposes of the sentencing proceedings. See *Hall v. State, supra,* 63 Wis.2d 304.

resentation must be equal to that which the ordinarily prudent lawyer, skilled and versed in criminal law, would give to clients who had privately retained his services."

A lawyer has a right to select from the available defense strategies. *Lee v. State,* 65 Wis.2d 648, 655, 223 N.W.2d 455 (1974). The lawyer in this case may have felt that by limiting the jury's choices to "guilty of robbery" and "not guilty of robbery," that Koller's chances of acquittal were greater. The fact that his strategy failed does not mean that his representation was inadequate.

The defendant also cites as evidence of counsel's ineffectiveness his failure to object to jury instructions which omitted the language, "the defendant is not required to prove his innocence." For reasons discussed below in connection with the adequacy of the jury instructions, this argument must also fail.

## ISSUE #2: WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE JUDGMENT OF CONVICTION?

Two statutes (1975 Stats.) are involved in this case:

"943.32. **Robbery** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or

"939.05. **Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a)  Directly commits the crime; or

"(b)  Intentionally aids and abets the commission of it; or

"(c)  Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his mind and no longer desires that the crime be committed and notifies the other parties concerned of his withdrawal within a reasonable time before the commission of the crime so as to allow the others also to withdraw."

The trial court instructed the jury, consistent with Wisconsin Jury Instruction 1475 as follows:

"Before the defendants may be found guilty of robbery under Section 943.32(1)(a), the district attorney must prove by evidence which satisfies you beyond a reasonable doubt that there were then and there the following three elements of this offense: First, that the defendant took property from the person or from the presence of one in the possession thereof. The value of the property is immaterial. Second, that the defendants or defendant at the time of the taking, had an intention to steal; that is, they had the intent to take and carry away the property of another without his consent knowing that it belonged to another and they had no right to take it and with the intent thereby to deprive the owner permanently of its possession. Third, that the defendant or defendants used force against the person in possession with intent thereby to overcome his physical resistance or physical power of resistance to the taking and carrying away of such property."

The evidence in this case must support the conclusion that the defendant is either guilty of all these elements, or that he intentionally aided and abetted the commission of the crime, under sec. 939.05, Stats.

When the defendant challenges the sufficiency of the evidence, the test is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *State v. Johnson,* 11 Wis.2d 130, 135, 104 N.W.2d 379 (1960). Conversely stated, the test is whether, when considered most favorably to the state and the conviction, the evidence is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." *Peters v. State,* 70 Wis.2d 22, 33, 233 N.W.2d 420 (1975). Furthermore, it is not necessary that this court be convinced of the defendant's guilt but only that the court is satisfied the jury acting reasonably could be so convinced. *State v. Shaw,* 58 Wis.2d 25, 29, 205 N.W.2d 132 (1973). *Taylor v. State,* 74 Wis.2d 255, 265, 246 N.W.2d 516 (1976). A conviction may be based in whole or in part upon circumstantial evidence. *Bautista v. State,* 53 Wis.2d 218, 223, 191 N.W.2d 725 (1971). The test for circumstantial evidence is whether it is strong enough to exclude every reasonable hypothesis of innocence. *Taylor v. State, supra,* 74 Wis.2d at 265.

Since no witness testified to seeing Nauertz's wallet being taken from him either by Koller or Frankovis, the conviction is based in part on circumstantial evidence. Mr. Nauertz had the wallet with him when he entered the tavern. He had it in his right back pocket, attached to a chain which was clipped to his belt. He next saw it when the police returned it to him at the Police Administration Building. Since the evidence showed that he was set upon as soon as he entered the door of the tavern, he never got near the rear door. There is no reasonable possibility that Nauertz lost the wallet near

the rear door. Officer Gross testified that a man who identified himself as Robert Koller threw the wallet to the ground as he left the bar by the rear exit.

It is true that Officer Gross did not identify Koller in court, but instead identified his codefendant Frankovis. But the other officers who saw Gross enter the bar with a man in custody identified that man as Robert Koller. Moreover, Koller in his own testimony, said that he left the tavern through the real exit. Ms. Johnson testified that Frankovis was still on top of Nauertz in the front alcove shortly after the police entered the front door. Three witnesses testified that they saw Koller kicking Nauertz—Ms. Johnson, Officer Baier, and Officer Simet. While Baier did not actually see Koller's foot make contact with Nauertz's body, Ms. Johnson and Simet did. It is true that her veracity was called into question in light of her admissions that she had given false testimony on previous occasions, but credibility is for the jury to determine. *Turner v. State,* 76 Wis.2d 1, 250 N.W.2d 706 (1977). The jury had a right to believe that she was telling the truth, particularly when her story corroborated that of the police officers.

The jury could find beyond a reasonable doubt that Koller participated in the attack on Nauertz. In *Bautista v. State, supra,* this court upheld the conviction of two defendants of robbery, party to a crime, where it was clear that neither defendant took the purse from the victim, but they both participated in a vicious attack upon him.

"Such an assault can be part of and an aggravation of the crime of robbery. A physical assault, such as described in the evidence herein, is not only a heinous crime itself but can be a part of a planned robbery in that it renders the victim either incapable or too fearful to resist." *Bautista v. State, supra,* 53 Wis.2d at 224.

The evidence is more than sufficient to support the conviction.

ISSUE #3: WAS THE DEFENDANT DENIED THE BENEFIT OF THE PRESUMPTION OF INNOCENCE BECAUSE THE TRIAL COURT, IN ITS INSTRUCTIONS TO THE JURY, FAILED TO INCLUDE THE STATEMENT, "A DEFENDANT IS NOT REQUIRED TO PROVE HIS INNOCENCE."?

The defendant asserts that he was prejudiced by two alleged errors made by the trial court in instructing the jury. First, the court neglected to include in its instructions the language, "a defendant is not required to prove his innocence." See Wis. J.I.—Criminal 140.

The law requires that instructions given to a jury be considered in their entirety, and

". . . if the error is rendered harmless because of other correct statements of law contained in the instructions, there are no grounds for reversal. *Werner v. State,* 66 Wis.2d 736, 750, 226 N.W. 402, 408 (1975). Furthermore, even if the error is not rendered harmless by other portions of the instructions, there is no reversible error unless it may reasonably be said that had the error not been made, the verdict might probably have been different. *Werner v. State, supra; Claybrooks v. State,* 50 Wis.2d 79, 86, 183 N.W.2d 139, 143 (1971)." *Loveday v. State,* 74 Wis.2d 503, 518, 247 N.W.2d 116 (1976).

In charging the jury, the trial court stated that

"The burden of proving the defendants guilty individually of the crime charged of robbery is upon the District Attorney and before you can render a verdict of guilty as to the crime charged as to either of the defendants, the District Attorney must prove to your satisfaction, beyond a reasonable doubt, that the defendants individually, Robert Lee Koller and Gregory Allen

Frankovis, are guilty of each and every element of the crime charged as I have explained them to you. If you can reconcile the evidence upon any reasonable hypothesis consistent with the defendants innocence individually as to the crime charged, then you should do so and acquit them individually.

"Every person charged with the commission of an offense is in law presumed to be innocent. This presumption attends the defendants throughout the entire court trial and prevails at its end unless overcome by testimony which satisfies you, the Jury, of their guilt beyond a reasonable doubt."

Although it would have been preferable if the trial court had included the omitted language in its charge, the instructions quoted above properly describe the burden of proof.

The defendant also complains that the following instruction misled the jury to think it could convict both defendants if one of them were proven guilty:

"By proof beyond a reasonable doubt is not meant proof beyond all possible or imaginary doubt, but such proof is so meant as satisfies your judgments as reasonable persons and applying your reason to the evidence before you that the crime charged has been committed individually by *each or either* of the defendants and so satisfies you as to leave no other reasonable conclusion possible."

However, the court also told the jury

". . . if, after such scrutiny of all of the evidence in this case you entertain a reasonable doubt of either of the defendants' guilt, then you must acquit him of the crime charged, individually or collectively."

In addition to the passage quoted above the court repeatedly talked of the state's burden to prove its case against the defendants individually.

Finally, in explaining the four forms of verdicts which would be submitted to them, the court told the jurors

". . . You must make a finding of guilt or innocence as to each one of the defendants individually. You must specifically view and weigh the testimony as to each of the individual defendants individually and make separate findings as to each of the defendants."

Thus, even if the part of the charge to the jury complained of could have been more precise, any errors or misleading statements were overcome when the instructions are viewed as a whole. There is no basis for reversal on the question of the jury instructions.

ISSUE #4: DID THE ACTIONS OF THE TRIAL COURT INDICATE A BIAS AGAINST THE DEFENDANT AND DENY HIM THE RIGHT TO A TRIAL BY JURY IN AN IMPARTIAL FORUM?

The defendant cites several examples which he contends show judicial bias against him. First, the judge allowed the prosecutor to call Assistant District Attorney Frank Crivello as a witness for the state. Crivello, who prepared the criminal complaint in this case, was called to testify about an error in the complaint. The complaint stated that Gregory Nauertz (the victim) "heard Gregory A. Nauertz say 'hit him and kill him' to the other gentleman." Crivello said that there were problems with the automatic dictating equipment that day, and that the complaint should have read "heard Gregory A. Frankovis say 'hit him and kill him' to the other gentleman."

In *Peterson v. Warren,* 31 Wis.2d 547, 568, 143 N.W.2d 560 (1966), the court said, "The practice of permitting an attorney involved in the case to testify on behalf of his client is generally frowned on by the Canons of

Ethics of the American Bar Association and by this court. However, the attorney is competent and the policy against his testifying while remaining in the case as an attorney for one of the parties, is not absolute and the trial court may, within its discretion, permit the attorney to testify to prevent an injustice or redress a wrong."

Crivello was not conducting the trial. He testified to correct what was a clerical mistake. It does not appear that the trial judge abused his discretion in allowing him to testify. Furthermore, his testimony benefited the defense because he stated on cross-examination that Officer Baier, the policeman who signed the complaint, could not identify Koller at that time.

Next, the defendant quotes an exchange between his lawyer and the judge as evidence of bias. When Mr. Eisenberg objected to Crivello's taking the stand as a conflict of interest, he said, "I am sure I couldn't take the witness stand or call an attorney from my office." The court replied, "I am sure you couldn't. If you were trying the case you could not." It appears that the judge was only responding to the first half of Mr. Eisenberg's statement.

The defendant also points to a remark that the trial judge made outside the presence of the jury. When Mr. Eisenberg made a further objection to Crivello's testimony, the judge said, "Mr. Eisenberg, this witness has taken an oath to tell the truth, the whole truth and nothing but the truth. This witness is also an officer of the Court and has taken the oath as an attorney to be truthful at all times and ethical in his appearances before the Court. The Court is convinced that he will tell the truth, and nothing but the truth so help him God."

While this comment was unnecessary, it does not constitute grounds for reversal. Since the jury was not in

the courtroom when the judge made this statement, it had no prejudicial impact. In *Pulaski v. State,* 24 Wis.2d 450, 458, 129 N.W.2d 204 (1964), the judge made similar comments on the veracity of a witness *in the presence of the jury,* and the court made the following comments:

". . . in a jury trial, a trial judge must be ever careful not by word or action to unconsciously influence the jury or to convey any impression contrary to his impartial status. While we cannot approve the trial court's arguing with counsel over what the testimony showed or commenting on the veracity of a witness before a jury, we cannot find the isolated remarks in view of the whole testimony and the instructions on the weight and credit to be given to witnesses had any prejudicial effect on the jury or denied Pulaski of his constitutional right to a fair and impartial trial."

The defendant also asserts that the trial judge showed his bias when he allowed the prosecutor to recall a previous witness, but denied Mr. Eisenberg's request to recall Nauertz, one of the prosecution witnesses. Eisenberg was cross-examining Ms. Johnson, and he attempted to question her about an earlier incident at the Bus Stop Tavern in which Nauertz allegedly took a gun and fired at Frankovis and another companion and about whether Nauertz had subsequently lied about the incident. The court said that Eisenberg could not cross-examine Nauertz through Ms. Johnson's testimony. The following exchange took place:

*"Mr. Eisenberg:* The materiality is it relates that this woman is aware that Nauertz took a gun there for the purpose of shooting Drobac and Frankovis. That she knows he fired the gun at them while he was there and that afterwards, she has testified the police told Nauertz to lie about having a gun there and that Nauertz covered up his shooting his gun by replacing the firing pin and cleaning it out.
*"Court:* What has that got to do with her?
*"Mr. Klinkowitz:* I will submit it as hearsay.

*"Court:* You can't cross examine one witness on the testimony of another. You could have asked Mr. Nauertz this but not her.

*"Mr. Eisenberg:* I've got to lay a foundation with her.

*"Court:* Oh no, when you had him here you could have asked him those things.

*"Mr. Eisenberg:* He is still here.

*"Court:* You could have asked at that time if it were material to impeach his testimony. You can't impeach his testimony through her.

*"Mr. Eisenberg:* I don't think it makes any difference if I lay the foundation with her or him. Either way both of us has an opportunity to put him on the stand and ask him.

*"Court:* He has already been called and excused.

*"Mr. Eisenberg:* He is not excused, he is still here.

*"Court:* I excused him.

*"Mr. Eisenberg:* If the Court would have asked me I wouldn't have agreed to it.

*"Court:* I asked if you were through with him and you said yes.

*"Mr. Eisenberg:* I have no recollection of that."  [In fact, all the court said when Mr. Eisenberg finished cross-examining Nauertz was "that is all. Who is your next witness."]

This exchange does not show a specific request by Mr. Eisenberg to recall Nauertz to the stand. While Mr. Eisenberg argued with the judge as to whether the witness had been excused, this exchange falls far short of a request to recall the witness.

Later on, the court permitted the prosecutor to recall Officer Simet. Mr. Eisenberg objected that the court should not permit the recalling of Simet unless there was a showing of necessity. Mr. Klinkowitz said that an issue was raised on cross-examination of Assistant District Attorney Crivello as to the ability of the police officers to identify Koller. Officer Simet testified that he was able to identify Koller at the time the complaint was prepared. Officer Baier was also recalled, and he

testified that he was able to identify Koller to the district attorney.

There was no abuse of discretion in allowing the officers to return to the stand.

ISSUE #5: WAS THE DEFENDANT DENIED HIS RIGHT TO CALL WITNESSES IN SUPPORT OF HIS DEFENSE AND TO DUE PROCESS WHEN THE TRIAL COURT EXCUSED A WITNESS FROM TESTIFYING WHO ASSERTED HIS PRIVILEGE AGAINST SELF-INCRIMINATION AFTER BEING ADVISED THAT THE STATE MIGHT RE-FILE CHARGES AGAINST HIM WHICH HAD BEEN PREVIOUSLY DISMISSED?

William Kretlow, the bartender at the New Yorker Bar the night of the incident, was originally charged as a third defendant in the case. Bruce Jacobson, Mr. Kretlow's attorney, testified at the 974.06 hearing that at the charging conference Assistant District Attorney Crivello told him that "since the individuals involved as defendants in addition to Mr. Kretlow were members of the Outlaws motor gang or were affiliated somehow with the Outlaws motor gang, that there had been a problem with witnesses testifying against these people, and that he was charging Mr. Kretlow basically to assure him that Mr. Kretlow would testify for the state or on behalf of the state at any other proceedings."

Mr. Crivello said that he couldn't recall ever making a statement that the state was charging Kretlow to force him to testify, but he conceded that the case against Kretlow was marginal. This was confirmed by his notes in the case file which said: "Strong case against Koller and Frankovis. Party to the crime against Kretlow is marginal. His testimony may be valuable later."

Kretlow was never tried for the offense. He entered into an agreement with the state to give a statement to the prosecutor and testify at trial. The agreement read:

"It is your understanding that in return for this statement and in return for testimony in the case which I mentioned before, case I–4085, the State has agreed to dismiss the case against you and to grant you full immunity from prosecution in this case for your testimony."

Mr. Kretlow gave the statement required by the agreement, and was available to testify. The charges against him were dismissed.

He was subpoenaed to appear as a witness for the state. However, at the trial, the prosecutor became uneasy when he saw Mr. Kretlow conferring with the defendants and their sympathizers. He also felt that Mr. Kretlow had been evasive during their initial conference. As a result, Mr. Klinkowitz decided not to call Mr. Kretlow as a witness.

Instead the defendants called Kretlow as a witness. He began to testify about the lighting conditions in the alcove of the tavern where the robbery allegedly took place, when the judge suddenly called the attorneys to the bench for an unrecorded conference. Then, the judge asked the attorneys and Mr. Kretlow to come into chambers

In chambers, the judge said:

"Mr. Kretlow, you are advised by the Court that during this trial the Court has been advised that you were a previous defendant in this case. The District Attorney has advised this court that you may be re-charged with this crime. So I am advising you at this time that anything you saw (sic) in this case in open Court, any answer you give or any information you give, may be used against you in a Court of law at a subsequent trial, if you are charged with this offense."

Mr. Kretlow then asked for his attorney, who arrived and asked the prosecutor if he would move for an immunity grant for Mr. Kretlow. Mr. Klinkowitz said that he would not move for immunity. The defendant asserts that the prosecutor said that if Mr. Kretlow asserted his Fifth Amendment privilege and stopped testifying, he would not be charged. But the trial transcript reveals no such statement by Mr. Klinkowitz. At the 974.06 hearing, Mr. Klinkowitz stated that he merely said that "if he continued to testify, he could be charged depending on what he said. . . . if he implicated himself as an active participant beyond what we know . . . he would be charged."

Mr. Kretlow then asserted his Fifth Amendment privilege to all further questions, and was excused by the judge.

The defense made an offer of proof that if allowed to testify, Mr. Kretlow would say that he did not see Koller in the alcove when he went to the front door and opened the door for the police, and that the alcove was too dark for the police to have made the identification of the assailants. He testified to that effect at the 974.06 hearing.

Sec. 972.08(1), Stats., gives the district attorney the power to move for immunity for witnesses who refuse to testify on Fifth Amendment grounds:

"972.08. **Incriminating testimony compelled; immunity.** (1) Whenever any person refuses to testify or to produce books, papers or documents when required to do so before any grand jury, in a proceeding under s. 968.26 or at a preliminary examination, criminal hearing or trial for the reason that the testimony or evidence required of him may tend to incriminate him or subject him to a forfeiture or penalty, he may nevertheless be compelled to testify or produce such evidence by order of the court on motion of the district attorney. No person who testifies or produces evidence in obedience to the command of the court in such case shall be liable

to any forfeiture or penalty for or on account of any transaction, matter or thing concerning which he may so testify or produce evidence, but no person shall be exempted from prosecution and punishment for perjury or false swearing committed to so testifying."

This court has on several occasions rejected the argument that defendants should have a reciprocal power to immunize witnesses: *Peters v. State,* 70 Wis.2d 22, 233 N.W.2d 420 (1975); *Elam v. State,* 50 Wis.2d 383, 184 N.W.2d 176 (1971); *Hebel v. State,* 60 Wis.2d 325, 210 N.W.2d 695 (1973); *Sanders v. State,* 69 Wis.2d 242, 230 N.W.2d 845 (1975).

In *Peters v. State, supra,* 70 Wis.2d at 40, this court discussed the policy reasons against giving defendants power to immunize witnesses:

". . . The district attorney, as the representative of the state, is charged with the enforcement of the criminal laws of the state. Any suspension of the criminal laws by grant of immunity where the state, through the district attorney, has not waived its right to prosecute by making the motion for immunity would be of questionable validity. Secondly, the potential for disruptive, collusive or frivolous use of such motions by the defense would be present because the defense has nothing to lose and much to gain by such motions. The state, on the other hand, is kept in check by the fact that it has to weigh the question of whether it should forego prosecution of one party in order to gain sufficient evidence for the conviction of other parties. Finally, the United States Supreme Court has repeatedly examined nonreciprocal immunity statutes, without any indication of their constitutional infirmity from this point of view. Such statutes have been said to have 'historical roots deep in Anglo-American jurisprudence' and have become 'part of our constitutional fabric.' " (Footnotes omitted.)

However, the court in *Peters* went on to say that while the immunity is primarily intended for the benefit of the prosecution,

". . . it must not be forgotten that the 'duty of the prosecutor is to seek justice, not merely to convict.' When the prosecutor is considering whether or not to make a motion for immunity, he should bear in mind this predominant objective of impartial justice, and not merely whether the evidence will be favorable to the prosecution. He should not hesitate to move for immunity solely on the ground that the testimony thus elicited might exonerate the defendant." *Id.* at 40–41.

The prosecutor did not break his agreement with the witness. The agreement was that Kretlow would be given immunity if he testified for the state. The prosecutor was under no obligation to move for immunity if he did not use him at trial. The prosecutor had a right to make the tactical decision not to call Kretlow because he viewed him as an unreliable and evasive witness.

The question remains, however, whether the witness was coerced into silence by threats of prosecution. A fundamental element of due process of law is the defendant's right to present witnesses in his defense. *Washington v. Texas,* 388 U.S. 14 (1967). In *Webb v. Texas,* 409 U.S. 95 (1972), the Supreme Court reversed the conviction where the trial judge gratuitously and harshly admonished the sole defense witness on the dangers of perjury, vowing that he would personally oversee his prosecution for perjury. As a result, the witness refused to testify.

In *United States v. Thomas,* 488 F.2d 334 (6th Cir. 1973), Thomas and two co-defendants were indicted on counterfeiting charges. At the close of the government's case, co-defendant Asaro received a directed judgment of acquittal. Asaro was the first witness called by the defense to testify. Thomas' attorney advised Asaro that his testimony could lead to prosecution for misprision of a felony, and asked if he wanted to confer with his attor-

ney. Asaro acknowledged the advice but declined to seek counsel. The trial court then made an additional explanation of the matter and upon further inquiry from Thomas' counsel, Asaro agreed to consult counsel. During a short recess called for that purpose, Asaro was approached by a secret service agent who was sent by the U. S. Attorney and told that he would be prosecuted for misprision of a felony if he testified in the case. The agent maintained that he had only advised Asaro that he *could* be prosecuted if he took the stand. The court found that this communication with Asaro was an attempt to intimidate him.

"There is no question but that it was completely unnecessary for the Government to approach the prospective witness. The transcript reveals that both the District Judge and counsel for the co-defendant Thomas went to considerable lengths to advise Asaro that his decision to testify should be based on full knowledge of the consequences, confirmed through his own counsel. Consequently the actions of the Assistant U. S. Attorney, through the secret service agent, in seeking out the prospective witness and on an ex parte basis gratuitously admonishing him cannot be viewed as serving any valid purpose, even accepting the assertions of good faith." *Id.* at 336.

In *United States v. Morrison*, 535 F.2d 223 (3rd Cir. 1976), the prosecutor on at least three occasions warned the witness through the attorney that she was liable to be prosecuted on drug charges, that if she testified that testimony would be used as evidence against her, and that she could be prosecuted under federal perjury statutes. He even went to the length of sending her a subpoena to come to his office, with the apparent purpose of intimidating her. She refused to answer more than thirty questions asked by the defense, on the grounds of self-

incrimination. The order denying a new trial was reversed.

In *United States v. Smith*, 478 F.2d 976 (D.C. Cir. 1973), the prospective witness Twitty was at the scene when the defendant Smith shot the victim Williams. There was no dispute that Smith borrowed a pistol from his codefendant Jarvis and fired a single shot which killed Williams. The government introduced evidence tending to show that Williams did not have a weapon in his hand when he was shot. The defendants' version of the incident was that Williams kept coming at Smith with a razor, and Smith shot him to defend himself. Twitty would have testified that he saw a razor in Williams' hand at the time of the shooting. On the morning of the second day of the trial, the Assistant U. S. Attorney approached Twitty and advised him to seek independent legal counsel, and that he could potentially be prosecuted for carrying a dangerous weapon, and as an accessory after the fact because he had carried the weapon back to Jarvis after the shooting.

The court reversed the convictions stating:

"We think the prosecutor's warning was plainly a threat that resulted in depriving the defendants of Twitty's testimony. The government argues in its brief that Twitty had a right to be advised that he might incriminate himself and be subject to prosecution if he elected to testify, and the government suggests that the prosecutor was only protecting Twitty's rights when he warned him. Even if the prosecutor's motives were impeccable, however, the implication of what he said was calculated to transform Twitty from a willing witness to one who would refuse to testify, and that in fact was the result. . . . If the prosecutor thought the witness should be advised of his rights then he should have suggested that the court explain them to Twitty. The matter would have been presented to Twitty by the court without any threats or implication of retaliation."

In the instant case, there were no ex parte communications with the witness. The prosecutor did what the

court in *Smith, supra* said was the proper course—he advised the judge of the situation and the judge informed the witness of his rights.

Proceedings under sec. 974.06, Stats. 1975, are civil in nature and the burden of proof is on the defendant, Sec. 974.06(6). The hearing judge's findings will not be upset unless they are against the great weight and clear preponderance of the evidence. *Bergenthal v. State,* 85 Wis.2d 590, 271 N.W.2d 30 (1978). The hearing judge found that Kretlow's refusal to testify after being advised of his rights was his own free and voluntary judgment. This finding is not against the great weight and clear preponderance of the evidence, since there was evidence that the district attorney did not say that the witness would be prosecuted if he did not stop testifying, but rather that the witness *could* be prosecuted if he incriminated himself by his testimony.

ISSUE #6: DID THE TRIAL COURT ABUSE ITS DISCRETION IN STRIKNG TESTIMONY GIVEN BY THE WITNESS PRIOR TO HIS ASSERTION OF THE PRIVILEGE AGAINST SELF-INCRIMINATION?

The defendant asserts that Kretlow waived his privilege against self-incrimination by the testimony he gave prior to invoking the privilege. The defendant cites the court to *Rogers v. United States,* 340 U.S. 367 (1951), in which a witness called before a grand jury testified that she had been a member of a local communist party, had served as treasurer, had been in possession of the membership and dues records but had turned these materials over to someone else. When asked the name of the person to whom she had delivered these materials, the witness refused to answer and invoked the privilege against self-incrimination. The court sustained a criminal contempt conviction against the wit-

ness, ruling that she had waived the privilege by not asserting it before giving self-incriminating testimony.

However, the court in *Rogers* pointed out that the witness originally declined to answer the question on an untenable ground—that she wished to protect others from punishment. "Petitioner's claim of the privilege against self-incrimination was pure afterthought." *Id.* at 371. The court pointed out that the privilege is solely for the benefit of the witness, and not to shield others. In addition, Mrs. Rogers had already incriminated herself by her earlier testimony about her party activities.

The instant case is quite different. Mr. Kretlow, in the short time he had testified before asserting the privilege, said nothing of an incriminating nature. Moreover, the record supports the contention that had Mr. Kretlow understood the situation before he began testifying he would have said nothing. As soon as Mr. Kretlow was advised of his rights by the judge, he immediately requested that his attorney be called. Once his attorney arrived and made clear the situation to him, Mr. Kretlow asserted his Fifth Amendment privilege. If Mr. Kretlow waived his privilege by his earlier testimony, it was not a knowing waiver.

As Justice Black pointed out, dissenting in *Rogers, supra*

"Of course, it has never been doubted that a constitutional right could be *intentionally* relinquished and that such an intention might be found from a 'course of conduct.' *Shepard v. Barron*, 194 U.S. 553, 568. But we have said that intention to waive the privilege against self-incrimination is not 'lightly to be inferred' and that vague and uncertain evidence will not support a finding of waiver. *Smith v. United States*, 337 U.S. 137, 150, relying on *Johnson v. Zerbst*, 304 U.S. 458, 464, and cases there cited." 340 U.S. at 376–377.

In *State v. Monsoor*, 56 Wis.2d 689, 203 N.W.2d 20 (1973), a defense witness refused to answer a question

on cross-examination about his personal use of marijuana. This court held that a trial judge has discretion to strike the testimony of a person who refuses to answer questions on cross-examination if the questions relate to the subject matter of his direct examination and are not simply directed at his credibility.

Mr. Kretlow had testified only for a short time before asserting his Fifth Amendment privilege. He testified that the defendants were present in the bar, that he was in the process of closing up, and that he had turned off the lights in the bar. His testimony went to material issues in the case, and it is unlikely that the prosecutor would have failed to cross-examine the witness on these subjects.

Once Mr. Kretlow asserted his privilege and stopped testifying, it was evident that he would answer no further questions. It is also apparent that had he known the situation before being advised of his rights, he would have answered no questions at all. Since the prosecutor would have been unable to cross-examine Mr. Kretlow on any of the matters to which he testified, the court acted within its discretion in striking the testimony.

ISSUE #7: SHOULD THE TRIAL COURT HAVE REASSIGNED THE CASE TO ANOTHER JUDGE TO HEAR THE 974.06 MOTION ON THE GROUND THAT HE WAS A MATERIAL WITNESS TO THE EVENTS THAT OCCURRED DURING THE UNRECORDED CONFERENCE AT THE BENCH?

The record clearly establishes that Mr. Kretlow was not a party to the off-the-record conference between the trial court and the attorneys. It was only when he attended the recorded conference in the judge's chambers that he was informed of the situation. Thus, the unrecorded conference cannot be material in this case be-

cause the issue is whether he was coerced by what he was told by the judge or district attorney. He could not be coerced by events of which he had no knowledge. Thus, there was no reason for the judge to assign the 974.06 hearing to another judge.

*By the Court.*—Judgment and orders affirmed.

COFFEY, J., took no part.