Fred ANGEL, Petitioner-Appellee,

v.

Roger OVERBERG, Superintendent,
Respondent-Appellant.

No. 80–3546.

United States Court of Appeals,
Sixth Circuit.

Argued April 2, 1981.

Decided Nov. 25, 1981.

Rehearing En Banc Granted
Feb. 11, 1982.

William J. Brown, Atty. Gen. of Ohio,
David E. Stocker, Asst. Atty. Gen., Colum-
bus, Ohio, for respondent-appellant.

Michael A. Marrero, Cincinnati, Ohio,
court appointed, for petitioner-appellee.

Before KEITH and KENNEDY, Circuit
Judges, and MANOS,* District Judge.

MANOS, District Judge.

The State of Ohio appeals the district
court's grant of a writ of habeas corpus on
the ground of prosecutorial misconduct dur-
ing the murder trial of appellee, Fred An-
gel. The only issue presented to this court
for review is whether statements by the
prosecutor violated Angel's Sixth and Four-
teenth Amendment right to a fair trial.

---

* Hon. John M. Manos, Judge, United States Dis-
trict Court for the Northern District of Ohio, sitting by designation.

On July 1, 1977 Angel was drinking heavily at the Turf Club bar in Hamilton, Ohio. In the early hours of July 2, 1977, the decedent, James Lang entered the bar. An angry verbal exchange ensued between the two men which escalated into a physical confrontation outside of the bar. The two men scuffled until Angel, who claimed he had suffered a knife wound, managed to free himself. Angel testified that at this point he walked to his car which was parked nearby and removed a gun from its trunk for the purpose of warning Lang to leave him alone. Failing to heed this warning, Lang pursued Angel and resumed the scuffle during which the gun discharged, fatally wounding Lang in the chest. Angel then disappeared into an alley near the Turf Club where he threw the gun into a trash can.

Subsequent to the shooting Angel returned to the Turf Club and was present when Hamilton Police Officer Nugent arrived to investigate Lang's death. After being given the *Miranda* warnings [1] Angel gave a statement to the police in which he denied being present at the Turf Club when Lang was shot.[2] Angel was arrested nearly three weeks later after the police had conducted an investigation. He made no further statements either at the time of his arrest, or prior to trial. During his trial Angel did not claim the defense of alibi. He did, however, assert the affirmative defense of self-defense.[3] On cross-examination Angel admitted that he had given a false statement to the police on July 2, 1977, and that he had neither shown his wound to police at that time, nor, mentioned it any time while he was in police custody.

In October, 1977, despite his assertion of the affirmative defense of self-defense, Angel was convicted of voluntary manslaughter. At trial there was conflicting testimony as to whether Lang or, Angel had started the fight and as to whether Angel had pointed the gun and fired or the gun had simply discharged during the scuffle.

In granting the writ of habeas corpus the district court held that the prosecutor made repeated prejudicial statements which were cumulatively "so egregious as to render Angel's trial fundamentally unfair," and, therefore, constitute a denial of due process.[4] *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir.), *cert. denied*, 444 U.S. 936, 100

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Statement of Fred Angel to Hamilton Police, July 2, 1977:

   Yesterday about 5:00 P.M. I went to Sam Hayres place on So. Erie Pkway. I've known Sam for approx. 9 yrs. and worked for him three or four years. Sam and Gary, my brother, was just getting off work. We went to Hazelwoods and had about three beers. We then left there and went to the Turf Club. I, stayed at the Turf Club until after midnight. The people I remeber (sic) at the bar is my brother Gary Angel, Earl Baker, Sam & Loretta Hayre, and Gail Kirby. After midnight I called my wife and told her to come and get me. I, was drunk as hell. My wife Joyce came and picked me up and we went and got something to eat at the Country Kitchen in Fairfield. I had my car parked in back of Keneer Dodge. When I went past the Turf Club, I saw two police cruisers at the Turf Club. From there I went straight home and went to bed. I got up at 11:00 AM this morning. Joyce called my Phillips 76 Station at Fairgrove and Dan Asher told her about the shooting at the Turf Club. I haven't owned a gun since 1970. When I came back by the Turf Club, I stopped my car and went into the Turf Club. I saw Ptl. Nugent, Earl Baker and another woman and man setting (sic) in the place. I, don't have any knowledge about who shot Jimmy Lang.

3. To corroborate his claim of self-defense Angel testified that following the shooting his sister-in-law took a photograph of the knife wound Lang allegedly inflicted upon him. His sister-in-law testified on his behalf and the photograph was admitted into evidence at trial. To rebut the self-defense claim, Officer Nugent testified that although he saw Angel at the Turf Club on July 2, 1977, he saw no knife wound.

4. While the district court found that a comment made by the prosecutor on Angel's silence was "arguably" a violation of the due process standard established by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the court did not find it necessary to reach that issue holding instead, that other comments by the prosecutor had denied Angel a fair trial. Since the *Doyle* issue was not held determinative, there is no reason for this court to address it.

S.Ct. 286, 62 L.Ed.2d 196 (1979); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979). This court agrees that prosecutorial misconduct denied Angel a fair trial and affirms the grant of the writ of habeas corpus.

The thrust of the prosecutor's argument concerned the election of the defense counsel to reserve opening statement until after the state of Ohio had put on its case-in-chief. The prosecutor used defense counsel's right to reserve opening statement to suggest that defense counsel acted in bad faith in order to gain the advantage of hearing the state's evidence prior to deciding whether to present a defense premised upon alibi or self-defense.[5]

The court is in agreement with the district judge's holding that the prosecutor's comments concerning an alibi defense were made in a clear effort to confuse the jury, and to bolster his theory that defense counsel waited until trial to manufacture their theory of defense.

Rule 12.1 of the Ohio Rules of Criminal Procedure requires that notice be given seven days in advance of trial if a defense of alibi is going to be presented. Without such notice an alibi defense will be excluded absent a showing that justice requires otherwise. The record reflects and the prosecutor was well aware that defense counsel had not given notice of any intention to present a defense based on an alibi. Furthermore, the only suggestion of an alibi was elicited by the prosecutor during his cross-examination of Angel concerning his prior inconsistent statement to the Hamilton police.

In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934), the Supreme Court in prohibiting prosecutorial use of insinuations, misstatement of facts and comments concerning facts or information not in evidence, held: "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it·is to use every legitimate means to bring about a just one." 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321 (1934).

Not only is the prosecutor's alibi comment false and misleading, but it also implies that Angel was obligated to present some defense at trial, which is contrary to both the never shifting burden of proof

---

5. Tr. 668–69, Argument of Prosecutor.

Another defense tactic. And I want you to bear this one closely in mind, because it has a great deal to do with the way you consider the evidence that they put on the witness stand. Mr. Bressler said this was going to be a search for the truth, but when do they say anything about self-defense. They didn't even give you a hint of that defense on voir dire. At no time had they ever said a word about self-defense. If you'll recall Mr. Bressler asked the Judge can I reserve my opening statement to the end of the State's case. Did he get up there like a man and say listen, we're going to prove it was self-defense, et cetera, et cetera, et cetera—and these words were said and those words were said. Well the reason they didn't do that is very simply, because they didn't know what their defense was going to be. You see they had a lot of options. First of all, beginning with Melba Gentry. If all of the State's witnesses were like Melba Gentry there wouldn't be any defense at all. And they'd shoot for a hung jury. Or, they had a shot at alibi because their man claims he wasn't there in the only statement that he gave to the police.

But they wait until I have put on my case and then they know—oh, we'd better do something. We'd better say this was self-defense—

That's when they get around to it, after they've heard and had an opportunity to sit and listen, to examine and to analyze, to have their secretaries prepare the transcripts of all the witnesses' testimony. That's when they start putting this together. We've got to say its self-defense.

They had an option. This was one of the three options they had, and they were prepared for all three of them. They were prepared long in advance for those three options. And if you don't think that's true, well then consider what they did to poor Melba Gentry.

\* \* \* \* \* \*

Why was it necessary to go through it for two hours? Very simple. Because they didn't really plan to put on any self-defense if they could avoid it. They didn't want to put on any alibi if they could avoid that. They wanted everybody to be like Melbas, if they could; otherwise, if they're going to—why, if they're going to admit self-defense later on, why try to make it look as if what she's saying isn't true in the first place.

imposed upon the state in a criminal case, and the right of a criminal defendant to remain silent.

After raising the inference that the defendant's self-defense claim was a recent fabrication, the prosecutor went on to characterize certain defense witnesses as "last minute witnesses" called to bolster the sagging defense. He also accused defense witnesses of lying, and he implied they had done so with the advice and consent of defense counsel.[6]

In his motion for mistrial, defense counsel objected to the prosecutor's characterization of certain witnesses as "last minute witnesses." We agree with district court's holding that in the face of counsel's objection and the absence of evidence to the contrary, such a characterization was prejudicial to the rights of the defendant because it asserted personal knowledge on the part of the prosecutor to which the jury was apt to accord weight. *Berger v. United States, supra.*

The credibility which the jury assigned to the witnesses and their testimony was determinative to the return of a guilty verdict. Witnesses called by both sides offered testimony different from statements given to the police prior to trial. Nearly all the witnesses had been drinking on July 2, 1977, and they admitted to varying degrees of intoxication. Evidence of whether Lang or Angel precipitated the incident, and who pursued whom was the subject of contradictory testimony. Had the jury credited the testimony of Angel and other defense witnesses, it might have found that the prosecution had failed to prove guilt beyond a reasonable doubt.

The manner in which the prosecutor chose to comment on inconsistent statements by defense witnesses and the defendant himself improperly implied that the defense attorneys had acted illegally and unethically. The clear import to be given the prosecutor's use of "they" in his argument includes defense counsel and not so subtly suggests that counsel helped concoct the appellee's claim of self-defense and then counseled defense witness to give testimony at trial which differed from their police

---

**6.** Argument of Prosecutor, Tr. 671–74.

She [Melba Gentry] said exactly what happened to the best of her recollection. The police didn't make her say any of that stuff. What she said is true and they have to sit there and admit it. But they got a big benefit from that defense tactic. They got an opportunity, as I said, to weave their story. They heard the words that were spoken, so they're going to use the exact words and instead of saying that this man said those words, we'll make James Lang the speaker of those exact words. So who do they bring in as these last minute witnesses?

\* \* \* \* \* \*

And here's how they weave their story. Remember they asked her [Loretta Hayre] the question, Describe how Tinch kicked the man.

Remember Tinch said, "sorta like a football kick", like that.

And she came out to demonstrate, did she just get up and say, "He got up and stomped him like that." Huh-uh. She said, "It wasn't like this", "It was like that", because her story had to change the story given by Mr. Tinch. That's why. She had heard, she knew, she knew what she had to testify to, from them or from him, in order to change the testimony around after they'd had an opportunity to hear it all.

\* \* \* \* \* \*

And she's [Loretta Hayre's] a lady. And she spins out this story about James Lang's domestic problems; his domestic affairs, so to speak, and that brought out—rage in my mind—in your mind—and should have brought outrage in anybody's mind.

But they think that that's all necessary to weave this pattern, what they're going to claim is self-defense.

\* \* \* \* \* \*

If they said their statements were true, out goes their defense of self-defense. Now its just as simple as that.

So they start out by this, "oh, now we're going to admit that he lied to the police" to you. How could they avoid it? They can't avoid it. They have to admit that he lied, along with everybody else they called.

\* \* \* \* \* \*

None of that's there. They couldn't find any of it. Now that's scientific evidence; that is expert testimony. You don't have to rely on anybody's testimony to consider that important fact.

So this little dance, this little drama about where the gun was being held, doesn't mean anything, except that they're trying to lie.

**1056**

statements thereby commanding perjury as the only means of establishing a defense. Impugning the integrity of counsel is improper and may in some circumstances operate to deny a defendant the effective assistance of counsel. *See, United States v. Bess*, 593 F.2d 749 (6th Cir. 1979); *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980).

■ The prosecutor is ordinarily accorded great latitude in making his closing argument and may properly rebut and make fair response to argument made by defense counsel. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Cronnon v. Alabama*, 587 F.2d 246 (5th Cir.), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). There is a difference, however, between permissible rebuttal of impassioned remarks made by defense counsel and abuse by the prosecutor of his opportunity to convince the jury to sift and order the facts in concert with his own view of the case. *See: Houston v. Estelle*, 569 F.2d 372 (5th Cir. 1978).

■ Not all prosecutorial misconduct constitutes error which rises to a level that denies a defendant's right to due process. *Donnelly v. DeChristoforo, supra; Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The issue of whether prosecutorial argument is so egregious as to render a trial fundamentally unfair must be determined by the totality of circumstances surrounding each individual case. *Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979), *aff'd.*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981); *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir.), *cert. denied*, 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979). The factors which should be considered by the court in its analysis were summarized in *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976), as follows:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof introduced.

*See also: United States v. Bowen*, 500 F.2d 41 (6th Cir. 1974), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 322, 42 L.Ed.2d 278 (1975).

■ In the instant case the prosecutor's improper comments were not isolated, off-hand remarks. Rather they were deliberately calculated to mislead the jury and to gain a guilty verdict through the use of facts not in evidence, and insinuations that Angel, his attorneys and witnesses testifying on Angel's behalf were lying. Applying the due process standard to the instant case, this court holds that the cumulative effect of the prosecutorial misconduct which occurred at Angel's trial denied him a fair trial and that the instances of such misconduct cannot be dismissed as harmless beyond a reasonable doubt. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Eberhart v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979); *Minor v. Black*, 527 F.2d 1 (6th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 3190, 49 L.Ed.2d 1198 (1976). Accordingly, the grant of the writ of habeas corpus is affirmed.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

I respectfully dissent. While I agree with the majority's discussion of the proper legal standard we are to utilize in federal habeas corpus review of misconduct by a state prosecutor, I disagree that its application requires the result reached by the majority.

We must remember that we do not sit as an appellate court rectifying trial errors but only to ensure that prosecutorial misconduct is not so egregious as to render the trial fundamentally unfair. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Our Court has laid down the factors we are to consider in weighing the extent of prosecutorial misconduct in habeas cases. As noted by the majority:

> In every case, we consider the degree to which the remarks complained of have a

tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof introduced to establish the guilt of the accused.

*United States v. Leon,* 534 F.2d 667, 679 (6th Cir. 1976). That determination is to be made only after a consideration of the totality of circumstances surrounding each individual case. *Hayton v. Egeler,* 555 F.2d 599, 604 (6th Cir.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (1977). However, even when reviewing prosecutorial misconduct on direct appeal, this Court has remarked:

> More commonly, however, the complained-of conduct will not rise to *reversible* error, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury. [citations omitted]. Indeed, it is notable how often courts cite improper argument by a prosecutor and how seldom they reverse convictions because of it. (emphasis in original).

*United States v. Bess,* 593 F.2d 749, 757 (6th Cir. 1979).

At the outset, it must be noted that the prosecutor's arguments at issue here were all made in rebuttal argument and in response to a relatively harsh attack made by defense counsel upon the integrity and veracity of the police and the prosecutor. While this, of course, does not excuse prosecutorial error, it does serve to mitigate the severity of the harm. *See Cook v. Bordenkircher,* 602 F.2d 117, 121 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979). I am also of the opinion that the alleged errors were neither flagrant nor repeated. The reference to "last minute witnesses" did not, as the majority concludes, imply that the prosecutor had personal knowledge of facts outside the record; it could have equally implied that the witnesses did not come forward at the time of the investigation. The argument that defense witnesses were lying was certainly not improper where those witnesses had testified that their earlier statements to the police were false. I am unconvinced

that the references to defense counsels' trial tactics and the integrity of the defense, although improper, sufficiently affected the regularity of the trial to warrant habeas corpus relief. Of great importance to me is the complete absence of objection by defense counsel to any of the allegedly improper argument when it is apparent from the record that defense counsel knew how to object since they did so elsewhere and were sustained. Rather, defense counsel let the argument proceed to its conclusion and then moved for a mistrial. Finally, I find the evidence of guilt of voluntary manslaughter to be overwhelming and for that additional reason I would deny habeas corpus relief. *See Cook v. Bordenkircher, supra,* 602 F.2d at 121.

I do not believe the case can be distinguished from others which have denied habeas relief. In *Cook,* this Court noted "the extreme nature of prosecutorial misconduct required for a federal court to issue the writ." *Id.* at 120. There, the alleged misconduct also involved the prosecutor's closing argument where he pursued a persistent and pervading attack on the petitioner's character, including, most importantly, an attack which alleged that the petitioner was trying to 'forge' and 'steal' justice by 'conning' the jury with a made-up story. The prosecutor continually portrayed petitioner as a "lowlife" who had to be kept from society, exclaiming that he was worse than all of the " 'criminals' and 'traitors' in hell." *Id.* at 120. Notwithstanding what this Court characterized as the "inexcusable" conduct of the prosecutor, petitioner's conviction was upheld. *Cf. Houston v. Estelle,* 569 F.2d 372, 383 n.14 (5th Cir. 1978) (where the prosecutor flatly asserted that the defendant, his corroborating witnesses and his friends were liars; he characterized defense counsel as hypocrites and attempted to stigmatize every defense objection. The court stated: "This is not a case of isolated aberration. This is a litany of prosecutorial anathema prejudicial to the defendant." *Id.*) Because I feel that this case is far closer to the prosecutorial misconduct epitomized by the *Cook* line of cases rather than the *Houston* line of cases, I would reverse the judgment of the District Court and deny the writ of habeas corpus.[1]

---

1. Like the majority, I do not feel it necessary to discuss the "arguable" violation of the due process standard established by *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In any event, I am of the opinion that the recent case of *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), controls this case since Angel voluntarily gave an inconsistent post-arrest statement to the police.

## ON REHEARING EN BANC

A majority of the Judges of this Court in regular active service have voted for rehearing of this case en banc. Sixth Circuit Rule 14 provides as follows:

"The effect of the granting of a hearing en banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket as a pending appeal."

Accordingly, it is ORDERED that the previous decision and judgment of this court is vacated, the mandate is stayed and this case is restored to the docket as a pending appeal.

The Clerk will direct the parties to file supplemental briefs and the case will be rescheduled for oral argument.