**Scott MATTES, Petitioner-Appellant,**

v.

**John R. GAGNON, Superintendent, and Bronson C. LaFollette, Attorney General of the State of Wisconsin, Respondents-Appellees.**

**No. 82–1467.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1982.

Decided Feb. 16, 1983.

---

Donald T. Lang, Wis. State Public Defender, Milwaukee, Wis., for petitioner-appellant.

Pamela Magee Heilprin, Asst. Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for respondents-appellees.

Before WOOD and POSNER, Circuit Judges, and MORAN,* District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Scott Mattes, a Wisconsin state prison inmate, appeals from the judgment by the United States District Court for the Eastern District of Wisconsin which denied his petition for a writ of habeas corpus. His petition raised the same three issues presented in this appeal: (1) whether the introduction of hearsay violated the petitioner's right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution; (2) whether the alleged violation of the right to confrontation constituted harmless error beyond a reasonable doubt, and (3) whether the jury instruction on intent impermissibly shifted the burden of proof respecting an element of the crime from the prosecution to the defense. This court has jurisdiction to hear this appeal pursuant to 28 U.S.C. §§ 1291 and 2253.[1]

---

* The Honorable James B. Moran, United States District Judge for the Northern District of Illinois, is sitting by designation.

1. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), holds "that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims." *Id.* at 515, 102 S.Ct. at 1206. Thus, at the outset, the court must consider whether the petitioner succeeded in exhausting his state remedies as required by 28 U.S.C. § 2254(b) (1976), although the parties do not raise the question. For purposes of 28 U.S.C. § 2254(b), this court will find exhaustion of state remedies provided "the State was given a fair *opportunity* to address the federal constitutional issue." *Toney*

*v. Franzen,* 687 F.2d 1016 at 1021 (7th Cir. 1982) (emphasis in original). A fair opportunity "requires only that States be given 'the initial "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights,'" and "includes an opportunity for review by the highest court in the state." *Id.* at 1021 (quoting *Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 408, 30 L.Ed.2d 418 (1971)).

Following his conviction, Mattes appealed the right to confrontation issue to the Wisconsin Court of Appeals. *Mattes v. Wisconsin,* 90 Wis.2d 858, 279 N.W.2d 507 (Wis.App.1979) (unpublished). The appellate court failed to address the confrontation issue, however,

### I. *Background*

The indictment against the petitioner Mattes charged him and Joseph Sorce[2] with two counts of attempted first-degree murder. According to the evidence, Gregory Nauertz, with Dawn Wimmer as a passenger behind him on his motorcycle, was riding southbound on Wisconsin Highway 141. When they were passing under a highway overpass, Mattes dropped a 66-pound concrete block from the overpass which landed directly in front of the motorcycle. Nauertz testified that "there was no way or chance of avoiding hitting it." The motorcycle smashed into the concrete block and skidded 700 feet before coming to rest. As a result, both Nauertz and Wimmer sustained injuries.

Two eyewitnesses testified. Patrick Cooney testified that he observed a red van stopped at the overpass, saw a man on the edge of the overpass drop the concrete block onto the freeway, and watched that man run to the red van and drive off, proceeding west on the County Line Road.

The other eyewitness, Frederick P. Stratton, Jr., gave substantially the same account but added some details. According to Stratton, the man who dropped the concrete block was a white male wearing a brown shirt and dark pants. Additionally, he observed the license plate number of the van and that the driver of the van, Sorce, wore glasses and a horizontally striped shirt. Shortly after the incident, Stratton identified the van and its occupants at the intersection of the County Line Road and the Upper River Road.

Also, State Trooper Gregory Boening testified that while heading south on Highway 141, he saw Nauertz's motorcycle swerve and skid. Based on statements made by eyewitnesses, Boening pursued the red van. After the van spun to a stop, the passenger, who was clad in a brown T-shirt, threw out of the window a paper bag containing a loaded .38 caliber revolver. During his testimony, Boening made an in-court identification of petitioner and Sorce.

To establish a motive for the alleged attempted murders, the prosecution introduced evidence that Nauertz knew Sorce, that at the time of the attempted murder Nauertz was scheduled to testify in another case against an associate of the Milwaukee Outlaws (a motorcycle organization) named Robert Koller, and that Sorce and Mattes were connected with the Milwaukee Outlaws.[3] Nauertz testified that at the time of

---

merely ruling that Koller's testimony did not fit within any state hearsay exception but only harmless error resulted. The Wisconsin Supreme Court denied further review on June 28, 1979. *Mattes v. Wisconsin,* 90 Wis.2d 867, 280 N.W.2d 789 (Wis.1979). Thus, Mattes presented the opportunity to consider the confrontation issue to the Wisconsin Court of Appeals and to the Wisconsin Supreme Court, thereby exhausting his state remedies.

Mattes then filed a motion for post-conviction relief on the issue of the presumptive intent instruction pursuant to Wis.Stat. § 974.06. On May 19, 1980, the Wisconsin court denied post-conviction relief based on *Muller v. State,* 94 Wis.2d 450, 289 N.W.2d 570 (1980), upholding the challenged instruction. According to Mattes, further review of the presumption of intent instruction issue would have proved futile in light of the Wisconsin Supreme Court decision in *Muller v. State,* 94 Wis.2d 450, 289 N.W.2d 570 (1980).

The court concludes that Mattes exhausted his state remedies available with respect to the burden shifting instruction ground for relief. Although he could have appealed the adverse ruling on the post-conviction petition, Wis.Stat.

§ 974.06(7), the *Muller* decision rendered the appeal futile and, therefore, unnecessary to establish exhaustion. 28 U.S.C. § 2254(b); *Rose v. Lundy,* 455 U.S. at 542 n. 7, 102 S.Ct. at 1202 n. 7 (1982); *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Carter v. Estelle,* 677 F.2d 427 (5th Cir.1982).

**2.** Joseph Sorce was convicted of two counts of attempted first-degree murder as a party to the crime.

**3.** As the District Attorney indicated prior to trial:

Mr. Reddin: Your Honor, the State intends to prove that the motive for this attempted murder, which is certainly an issue in an attempted murder case, was that the victim—one of the victims, was going to testify in approximately one month against members or persons who the State will show are associated with the Milwaukee Outlaws, and that is the motive for dropping the concrete onto the victims.

Trial transcript as paginated in the Wisconsin Court of Appeals, Exhibit J–b, at 21–22, *Wisconsin v. Sorce,* No. I–5052.

the attempted murder he knew Sorce and was scheduled to testify against Robert Koller in the other case. Following up, over defense counsel's objections, Trooper Boening testified that Sorce's arm bore a tattoo depicting a skull and crossbones with the words "Milwaukee" above the picture and "Outlaws" below, and that the glove compartment of the van contained two ribbons, one reading "Our Brother" and the other, "The Outlaws." Further establishing the connection, State Trooper Charles Janssen also testified that, when arrested, Sorce wore a brass belt buckle reading "Outlaws."

Pursuing the motive line, the state then called Koller to the stand. Koller declined to testify relying on the Fifth Amendment right against self-incrimination. When the prosecutor asked Koller about his connection with the Outlaws and about his testimony on the subject at his own trial, Koller refused to answer.[4]

To establish Koller's prior testimony and his connection with the Outlaws, the state called the court reporter for the trial of *Wisconsin v. Robert Koller and Gregory Frankovis,* 87 Wis.2d 253, 274 N.W.2d 651 (1979). The state contended that Koller's testimony from the prior trial was admissible as a prior inconsistent statement. The defense objected on the grounds that any prior testimony could not be inconsistent with Koller's present assertion of the Fifth Amendment and that the testimony was hearsay. The trial court ruled that Koller's former testimony could be introduced as a prior inconsistent statement. The reporter testified that Koller had testified that, although he was not a member of the Outlaws, he had traveled places with them and his brother was one. The defense elected not to cross-examine the court reporter.

The defense called no witnesses and made no opening statement. Essentially conceding that the state had proved the acts alleged, defense counsel, in the closing argument, argued that the only issue was whether Mattes was guilty of attempted murder or the lesser included offense of endangering safety by conduct regardless of life and asked the jury to find Mattes guilty of endangering safety, but innocent of attempted murder.

At the close of the evidence, the trial court, without objection from the state, submitted an instruction and verdicts on the lesser included offense of endangering safety by conduct regardless of life as well as on attempted first-degree murder.[5] The instructions as to attempted murder con-

---

**4.** The prosecutor asked Koller, "Do you recall testifying at a jury trial in September in which you were a defendant?" Trial transcript as paginated in the Wisconsin Court of Appeals, at 115, *Wisconsin v. Sorce,* No. I–5052 (Jan., 1976). Koller replied, "I refuse to answer on the grounds it may tend to incriminate me." Following up, the prosecutor queried, "Do you recall being asked the following two questions and giving the following two answers, Now you said, 'Question, Now you said on direct examination that you are not a member of the Outlaws Motorcycle Club. Answer, That is correct, Question, You ride with them? [Answer,] I was at Don's place with them.'" *Id.* After the court overruled the defense's objection based upon lack of foundation, Koller replied, "I refuse to answer on the grounds it may tend to incriminate me." *Id.* at 116. Defense counsel declined to cross-examine Koller, stating, "Well, there have been no answers, if the Court please. No, I don't have any cross." *Id.*

**5.** First-degree murder is defined in Wis.Stat. § 940.01 as follows:

940.01 *First-degree murder.* (1) Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

(2) In this chapter "intent to kill" means the mental purpose to take the life of another human being.

"Attempt" is defined in Wis.Stat. § 939.32(2):

(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor.

The offense of endangering safety by conduct regardless of life is set forth as follows in Wis. Stat. § 941.30:

941.30 *Endangering safety by conduct regardless of life.* Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, is guilty of a Class D felony.

tained the following language on the element of intent:

> When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all the natural, probable and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous instrumentality, likely to kill then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended.

The jury found Mattes guilty of two counts of attempted first-degree murder.

## II. *Confrontation*

■ The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), requires that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause reflects a preference for face-to-face confrontation at trial, enabling the trier of fact to directly observe the demeanor of the witness in evaluating his credibility and rendering less likely false accusations by the witness due to the presence of the accused and the solemnity of the occasion. *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968); *Mattox v. United States,* 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). Additionally, the Confrontation Clause serves to ensure the accused an opportunity to cross-examine the witnesses against him. *E.g., California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Despite the importance of the purposes served by the Confrontation Clause, occasionally considerations of public policy if "closely examined" may warrant dispensing with confrontation at trial; such considerations include effective law enforcement, the necessities of the case, and the interest in development and precise formulation of the rules of evidence applicable in criminal proceedings. *Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980).

■ The important determination of whether the particular case justifies dispensing with confrontation, however, does not turn on whether common law hearsay rules would allow an exception, but upon whether the purpose of the Confrontation Clause to facilitate the truth determining process by providing the trier of fact with a satisfactory basis for evaluating the truth of a prior out-of-court statement is satisfied. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Thus, although the hearsay rule and the right of confrontation protect similar values, they are not synonymous. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970).

To determine whether a violation of the Confrontation Clause occurred, this court must first resolve three questions: (1) whether Koller, the out-of-court declarant, was in fact a witness against Mattes, (2) whether Koller was unavailable for cross-examination at trial, and (3) whether the circumstances of the case excuse the lack of confrontation.

*Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), indicates that Koller is to be considered a witness against Mattes. In *Douglas,* the state prosecutor called the defendant Douglas' alleged accomplice, Loyd, to testify. The already-convicted Loyd refused to testify on self-incrimination grounds because he planned to appeal his conviction. The trial court judge ruled that Loyd could not properly invoke the privilege because of his conviction and permitted the prosecution to cross-examine Loyd as a hostile witness. "Under the guise of cross-examination to refresh Loyd's recollection," the prosecutor read in court Loyd's signed confession and asked whether he recalled making such statement. *Id.* at 416, 85 S.Ct. at 1075. Refusing to affirm or deny making the confession, Loyd asserted the privilege against self-incrimination. The confession named Douglas as the person who pulled the trigger in the assault with attempt to murder charge.

Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.

*Id.* at 419, 85 S.Ct. at 1077.

The Court concluded that Douglas' rights under the Confrontation Clause had been denied because he was not afforded an adequate opportunity to cross-examine. "Since the [prosecutor] was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him." *Id.* at 419, 85 S.Ct. at 1077.

■■■ *Douglas* makes several important points. *Douglas* made clear that, even though the prosecution produces a witness at trial, the Confrontation Clause is not satisfied unless the defendant has an adequate opportunity for cross-examination. Second, *Douglas* establishes that presenting non-evidence to jurors can result in a violation of the Confrontation Clause if under the circumstances of the case the jury might have treated the non-evidence as evidence. Third, the court implicitly concluded that for purposes of the Confrontation Clause, Loyd was a witness against the defendant because (1) the jury might have considered the prosecutor's reading of Loyd's purported statement and Loyd's refusals to answer to be the equivalent of direct testimony, and (2) the jury might have improperly inferred from Loyd's invoking the Fifth Amendment both that he had made the statement and believed it

reflected the truth. *Id.* at 419, 85 S.Ct. at 1077.

The situation in the present case likewise created a risk that the jury considered Koller's testimony from a previous trial to be testimony against Mattes in this case. Koller's taking the Fifth Amendment to the prosecutor's statements rather than denying his prior testimony, "may well have been the equivalent in the jury's mind of testimony" that Koller had made the statements and that they were true. At that stage, however, there was in fact no evidence on this point. Then, the prosecutor called the court reporter from Koller's trial to read Koller's prior testimony into the record, ostensibly as a prior inconsistent statement. From the prosecutor's closing argument and the lack of any limiting instructions, it appears that the court admitted the prior inconsistent statement substantively on the point of Koller's relationship with the Outlaws.

Koller's reliance on the Fifth Amendment privilege not to incriminate himself rendered him unavailable for cross-examination.[6] *Accord, Phillips v. Wyrick,* 558 F.2d 489, 494 (8th Cir.1977) ("We conclude that Brownfield, by asserting his Fifth Amendment privilege, became an unavailable witness within the meaning of the traditional exception to the Sixth Amendment confrontation requirement . . . ."), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978). *Douglas* demonstrates that the Supreme Court does not require the exhaustion of all possible means of forcing a witness to testify before deeming him unavailable. The state does not contend that Koller was available for cross-examination and does not suggest that Mattes procured Koller's silence.[7]

Having concluded that Koller was a witness against Mattes and that Mattes lacked an opportunity to cross-examine Koller, the

---

6. For purposes of the Federal Rules of Evidence, a witness claiming the Fifth Amendment privilege not to testify is available until the court rules that such witness is exempt from testifying. D. Louisell & C. Mueller, Federal Evidence § 486, at 1028 (1980).

7. Although Mattes could have cross-examined the court reporter from Koller's trial, such cross-examination could only have gone to whether the reporter accurately recorded Koller's statements and could not have tested the truth of the assertions.

court must examine the circumstances to determine whether they atone for the absence of confrontation, as in the case of *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). *See also United States v. Barlow,* 693 F.2d 954 at 964–65 (6th Cir.1982). In *Dutton,* the defendant Evans was convicted of first-degree murder. During the course of the trial, the state called the witness Shaw. According to Shaw, he asked Williams, an alleged accomplice of Evans, "How did you make out in court?" and Williams responded, "If it hadn't been for that . . . Alex Evans, we wouldn't be in this now." *Id.* 400 U.S. at 77, 91 S.Ct. at 213. The trial court permitted the admission of this statement over the confrontation objection because it fit within the state's version of the hearsay exception for coconspirators statements. The state had failed to produce Williams for cross-examination or to demonstrate his unavailability. The four-man plurality of the Supreme Court, in an opinion by Justice Stewart, concluded that the defendant was not denied his right of confrontation.

In so ruling, the Court stressed that the Clause does not mandate exclusion of all out-of-court statements and rejected the notion that the Clause and the hearsay doctrine are congruent. *Id.* at 81–82, 91 S.Ct. at 215–216. The Court noted several factors which atone for lack of confrontation. These factors included the significance of the evidence in the particular case, and the degree of reliability of the hearsay. Additionally, the Court considered it of "peripheral significance" that the out-of-court statement fit within the state's version of the hearsay exception for co-conspirator's statements. *Id.* at 87, 91 S.Ct. at 219. *Cf. Vogel v. Percy,* 691 F.2d 843 at 846 (7th Cir.1982) (due process guidelines for substantive use of a prior inconsistent state-

ment). The Court in *Dutton* observed that the challenged evidence was not "in any sense 'crucial' or 'devastating.'" *Id.* 400 U.S. at 87, 91 S.Ct. at 219. The out-of-court declarant (Williams) in *Dutton* was not the principal prosecution witness, nineteen other witnesses testified against Evans, including a third accomplice named Truett who testified that Evans helped commit the murders in question. The out-of-court testimony only inferentially indicated that one of Evans' alleged accomplices considered Evans a guilty participant.

█ Here, only the out-of-court declaration by Koller establishes the connection between Koller and the Milwaukee Outlaws necessary for the state's motive theory. The evidence is not cumulative, but neither is it direct evidence of intent, only circumstantial. The motive evidence, however, was not the critical evidence respecting Mattes' intent to kill. Although recognizing the motivation for Mattes' action may have satisfied the jurors' curiosity, there was substantial evidence showing the murderous intent of Mattes. Dropping the block in front of the motorcycle was no act of negligence. No doubt existed as to Mattes' identity, and the evidence established that the 66-pound concrete block barely missed the targeted victims. Additionally, the established motive was consistent with Mattes' assertion that he was guilty only of endangering the safety of the victims; accepting Mattes' alleged motive, the jurors could have agreed that Mattes only intended to scare Nauertz from testifying. The Koller statement was not critical.

In *Dutton,* the evidence bore indicia of reliability and met the state's hearsay exception.[8] The out-of-court declarant in

8. The Court listed four indicia of reliability: First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's [an accomplice who had received

a grant of immunity in exchange for his testimony] testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances un-

*Dutton* had personal knowledge respecting the out-of-court statements underlying truth. Cross-examination of Williams, the Court concluded, would not show that Williams was not in a position to know whether Evans committed the murder. Furthermore, the Court deemed unlikely the possibility that Williams founded his statement on faulty recollection. Under the circumstances in which Williams made his statement to Shaw, Williams had no reason to lie. Moreover, Williams made the statement spontaneously, and the statement was against Williams' penal interest.

Here, indicia of reliability existed as well. Koller was in a position to know whether he and his brother belonged to the Outlaws. Cross-examination by the defense counsel herein would not likely reveal either lack of position to know the truth or faulty recollection on that point. Although the statement by Koller was not spontaneous nor necessarily against his penal interest, Koller was under oath at the trial where he made the statement.

The indicia of unreliability, however, outweighs the indicia of reliability. Cross-examination might have revealed the degree to which Koller associated with the Outlaws at the time of the attempted murder by Mattes and if Koller was aware of the plans to drop the concrete block. *See generally Phillips v. Wyrick,* 558 F.2d 489, 495 (8th Cir.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978). Moreover, since Koller gave the testimony at his own trial, he could well have had a reason to fabricate it. Furthermore, although Koller was under oath at the prior trial, the

jurors herein lacked the opportunity to observe his demeanor.

We are not satisfied that the out-of-court declaration here meets the prerequisites for either the state hearsay exceptions or those contained in the Federal Rules of Evidence. Although the Court in *Dutton* considered it of only "peripheral significance" that the statement therein fit within the state's hearsay exception, this court considers it of greater significance that Koller's statement does not fit within either the state or federal hearsay exceptions, and that both cross-examination and an opportunity to observe demeanor were lacking here. *See generally Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness."). Although the hearsay rules and the Confrontation Clause are not congruent, both are designed to afford the trier of fact an adequate basis for evaluating the truth of the prior statement. *Id.* We conclude that Mattes was denied his right of confrontation.[9]

### III. *Harmless error*

Although a violation of the Confrontation Clause occurred, the court concludes, however, that the admission of Koller's out-of-court declarations resulted in harmless error. In *Allison v. Gray,* 603 F.2d 633, 634 (7th Cir.1979), this court set forth the following test for harmless error when a violation of a defendant's federal constitutional rights occurred:

der which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a show that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant.
400 U.S. at 88–89, 91 S.Ct. at 219–220. *Accord, Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972).

9. In addition, this decision is consistent with the Supreme Court cases involving use of testimony given at a preliminary hearing, *Pointer v. Texas,* and *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In *Pointer,* where no adequate opportunity to cross-examine the witness at the preliminary hearing was afforded the defendant, the Confrontation Clause was not satisfied; however, in *Ohio* where the defense engaged in the functional equivalent of cross-examination, the requisites of the Clause were met.

The harmless error test to be applied to violations of federal constitutional rights is well settled. To hold such error harmless, the court must find it "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, [828], 17 L.Ed.2d 705 (1967). The question is "whether there is a reasonable possibility" that the error affected the jury's verdict. *Id.* In answering this question, the court must assess the "probable impact of the [error] on the minds of an average jury." *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

Koller's out-of-court statements clearly pertained to Mattes' motive for dropping the block off of the bridge. The key question, however, is whether there exists a reasonable possibility that Mattes' motive, assuming it was to prevent Nauertz from testifying against Koller, affected the jury's verdict.

Mattes contends that the motive evidence significantly increased the likelihood that the jurors would find Mattes guilty of attempted murder rather than the lesser included offense of endangering safety by conduct regardless of life. To support this contention, Mattes points out that (1) "submission of a lesser included offense is proper *only* when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction of the lesser offense," and (2) the state's arguments presented in its brief in the Wisconsin Court of Appeals took the position that "motive in the instant case was important ... as bearing on the issue of defendant's intent in dropping the 66-pound block of concrete from the bridge onto the cyclists below. Such evidence 'tended to increase the probability of [defendant's] guilt.' "

On this appeal, the state argues that any error in admitting Koller's testimony was harmless beyond a reasonable doubt. The state asserts that motive is not an element of murder and, therefore, is "a collateral matter insofar as actual elements of the criminal violation are concerned...." Additionally, the state claims that admitting Koller's testimony was harmless error because the evidence clearly established all of the elements of the crime.

Due consideration of the parties arguments leads this court to accept the conclusion reached by the district court below:

Petitioner's Outlaw connection may have been instrumental in helping the jurors to determine *why* petitioner dropped a 66-pound boulder from a highway overpass onto or dangerously near a motorcycle traveling at highway speed. That motive was not instrumental, however, in helping the jury determine *what* the petitioner intended to do. As the jury, no doubt, concluded, one simply does not drop a deadly boulder onto or dangerously near a motorcyclist traveling at a high rate of speed and then try to flee in a waiting van if he is merely playing a prank or even if he is trying to intimidate a member of a rival motorcycle club from testifying at a trial.

Regardless of any animus toward Nauertz, Koller's act of dropping a concrete block into the path of traffic showed a total disregard for life without regard to a particular motive. Koller's position on the overpass enabled him to observe the oncoming traffic until the last moment when the overpass blocked the view. The jury could easily conclude from the near hit by the block that Koller had carefully aimed and timed the drop of the block to land on Nauertz and Wimmer or at least to cause a life endangering accident. The fact that Koller then fled to a waiting van confirmed that Koller had set out to cause serious harm and was not simply strolling along while carrying a 66-pound block of concrete which slipped from his grasp, went over the railing and accidentally landed in the path of the motorcycle.

In addition, the motive established by Koller's testimony was consistent with Mattes' contention that he was guilty of endangering safety by conduct regardless of life. Because the evidence of motive did not create a reasonable possibility that the jury would conclude that the defendant intended to commit murder rather than sim-

ply endanger Nauertz's safety, the admission of such testimony without an opportunity to confront Koller was harmless beyond a reasonable doubt.

## IV. *Instructed Inference*

■ The appellant contends that the jury instructions, considered in light of the prosecutor's arguments at trial, shifted the burden of proof as to the element of intent in violation of the Fourteenth Amendment's mandate that the state prove beyond a reasonable doubt all of the elements of the crime. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The trial court instructed the jurors that:

> When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all the natural, probable and usual consequences of his deliberate acts. If one person assaults another violently with a dangerous instrumentality likely to kill then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended.

Although the appellant neglected to object at trial,[10] he now challenges the following comments on the issue of intent made by the prosecutor in closing argument:

> Now the Court will instruct you that a man intends the natural and probable consequences of his intentional act. The intentional act of dropping a 66-pound block of concrete onto unprotected motorcyclists going 55 miles an hour, in my opinion, and I believe that from the evidence and from your own common sense, you should believe that the natural and probable consequences of that are death. If there is a hit on that motorcycle.

> So that—and the Court will also instruct you that when a person assaults another with a deadly and dangerous instrumentality, it's normal to presume the consequences of that act which are death.

The intent, the natural and probable consequences of dropping it on a motorcycle with two passengers, the natural and probable consequences of that is that both are killed. That result under the law is intent. That is why I'm asking you to find these Defendants guilty of attempted murder of Gregory Nauertz and of the attempted murder of Dawn Wimmer.

In *Pigee v. Israel,* 670 F.2d 690 (7th Cir. 1982), this court upheld the instruction in question here as constitutional. The court in *Pigee* ruled that the instructed inference "would be interpreted by a reasonable jury as stating no more than a permissive inference, available only if there are no circumstances to prevent or rebut it." *Id.* at 695. Following *Pigee,* this court must hold that the instruction did not impermissibly shift the burden of proving intent to the defendant or relieve the state from proving intent beyond a reasonable doubt, unless the comments by the prosecutor misled the jury respecting the proper treatment of this instructed inference. The key issue, therefore, is to consider how the jury probably viewed the comments, *see United States v. Trapnell,* 638 F.2d 1016, 1026 (7th Cir.1980), in light of the judge's instruction as to the proper weight to be accorded the arguments of counsel and the judge's instruction respecting the allocation of the burden of proof respecting the element of intent. *See generally Taylor v. Kentucky,* 436 U.S. 478, 486–87, 98 S.Ct. 1930, 1935–1936, 56 L.Ed.2d 468 (1978); *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *United States v. McCollom,* 664 F.2d 56, 58 (5th Cir.1981), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982).

Here, the trial court properly instructed the jurors in accordance with *Pigee.* Additionally, the trial court judge told the jurors

---

**10.** In *United States v. Trutenko,* 490 F.2d 678, 680 (7th Cir.1973), Judge Stevens remarked:

> We consider it significant that experienced and competent trial counsel did not object to the prosecutor's comment.... [I]f the comment were sufficiently prejudicial to warrant reversal, counsel ... would have objected forthwith or else would have requested the trial judge to give a curative instruction.... The absence of any such request tends to corroborate our appraisal of the probable impact of the remark as minimal.

that the "State must prove by evidence which satisfied you beyond a reasonable doubt that" the defendant "intended to kill" the victims. The court proceeded to define intent to kill as meaning "the mental purpose to take the life of another human being." The court admonished the jury that intent to kill "must be found as a fact before you can find a Defendant guilty of attempted first-degree murder" and that the jury must find intent, if at all, from the acts, words, and statements of the defendants. At this point, the court gave the instruction on presuming intent. In conclusion, the court told the jurors that the "law presumes every person charged with the commission of an offense to be innocent" and that the "presumption attends the Defendant throughout the trial and prevails at its close unless overcome by evidence which satisfied the jury of his guilt beyond a reasonable doubt." Respecting the burden of proof, the court clearly instructed the jurors that "[t]he burden of proving the Defendant guilty of *every element* of the crime charged" falls upon the state, and that "[t]he Defendant is not required to prove his innocence."

Concerning the purpose of closing arguments, the court told the jury that closing argument is not evidence, but merely a "guide." In reaching a verdict, however, the trial judge stressed that the jurors were "to draw [their] own conclusions and [their] own inferences from the evidence, and to decide upon [their] verdict according to the evidence, under the instructions given [them] by the Court."

Thus, the state trial court judge clearly and accurately instructed the jurors respecting the allocation of the burden of proof regarding an element of the crime, the permissible inference of intent, the pur-

pose of closing arguments, and the duty of the jury to make their own findings and to follow the instructions as given by the court. *See generally United States v. Trutenko,* 490 F.2d 678, 680–81 (7th Cir.1973) (similarly considered prosecutor's comments in light of court's instructions). This case does not present a situation similar to *Taylor v. Kentucky,* 436 U.S. 478, 486, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468 (1978), where "the trial court's instructions were themselves skeletal, placing little emphasis on the prosecution's duty to prove the case beyond a reasonable doubt" and the court failed to give an instruction on the presumption of innocence.

Here, the prosecution referred to the intent inference without stating the qualifying language. Although the prosecutor could have been more precise by including the qualifiers,[11] the purpose of his comments was to guide the jury in the application of the inference which the trial court judge would later instruct them on, rather than to provide the jurors with an instruction on the inference. *Angel v. Overberg,* 664 F.2d 1052, 1057 (6th Cir.1981), *reh'g en banc granted* (Feb. 11, 1982) (where issue concerned whether prosecutorial argument was so egregious as to render trial fundamentally unfair, court considered whether challenged argument was "deliberately or accidentally placed before the jury"). Furthermore, the comments were not lengthy or pointed respecting the burden of proof. *Id.* at 1056 ("Whether they are isolated or extensive.") Moreover, the prosecutor noted in his comments that the trial court would instruct the jurors concerning the inference, thereby disclaiming any purpose to instruct the jury himself, unlike in *United States v. Bohle,* 445 F.2d 54, 69–70 (7th Cir.1971), and *United States v. Phillips,* 527

---

11. In *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–1873, 40 L.Ed.2d 431 (1974), Justice Rehnquist wrote for the Court:

> Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions [as repeated misrepresentations of evidence]. Such arguments, like all closing arguments of counsel, are seldom

carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear .... [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

F.2d 1021, 1022–23 (7th Cir.1975). *See generally United States v. Trutenko,* 490 F.2d 678, 680 (7th Cir.1973).

Furthermore, the court herein correctly stated the inference, not omitting the qualifying language as did the prosecutor. *See generally United States v. Bohle,* 445 F.2d at 70; *United States v. Phillips,* 527 F.2d at 1023 ("In our opinion, the statement of the prosecutor, left uncorrected by the court, could have led the jury to believe it had to find that the prosecutor and government witness violated the civil rights of the defendant in order to render a verdict of not guilty."). The judge's instructions aptly corrected any misconception the jurors received from the prosecutor's argument, rendering any error harmless. *United States v. Vargas,* 583 F.2d 380, 387 (7th Cir.1978). The court concludes, therefore, that the jury was not confused respecting the proper burden of proof on the element of intent. *See generally Angel v. Overberg,* 664 F.2d 1052, 1056 (6th Cir.1981) (should consider degree to which prosecutor's comment tended to mislead jury).

Although the court does not subscribe to the theory that two wrongs make a right, the court observes that in the closing argument of the defense, counsel stated: "Now the State will argue, and the instruction will argue, that a human being intends the natural and probable consequences of his act." Thus, not only did the defense fail to object to the prosecution's omission of the qualifying language, the defense itself failed to use the pertinent language. Arguably, the defense counsel might have been unaware of the *Sandstrom* and *Pigee* decisions; however, the court considers it more likely that the defense simply used a shorthand form of the instructed inference as did the prosecution without intending to thereby instruct the jurors as to the applicable inference in the case. Their use of this shorthand form indicates that the defense considered the effect of such statement to be inconsequential.

Accordingly, the judgment of the district court is affirmed.

MORAN, District Judge, concurring.

While I agree with Judge Wood's analysis, particularly since the disputed evidence was equally consistent with the defendant's theory of the case, I add but one comment respecting the contested instruction. Instructions are often selected during instruction conferences, from those which have survived on appeal. Substantially similar "presumption" instructions have now survived constitutional attack in *Pigee v. Israel,* 670 F.2d 690 (7th Cir.1982) and, accordingly, here. The conclusion that they do not offend the Constitution is, however, solely a conclusion that they may be permissible, not that they are desirable. One would hope that trial courts will heed the admonition to trial judges in *Pigee v. Israel, supra,* at p. 696, that they "would be wise in the future to avoid 'presumption' language in this area, in favor of language pointing out inferences which can permissibly be drawn from conduct and emphasis on the prosecution's burden at all times to prove guilt beyond a reasonable doubt."